USA v. C. Boyd
Exhibit G
1:24-CR-20255-WPD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
GILEAD SCIENCES, INC., GILEAD SCIENCES  :
IRELAND UC, and GILEAD SCIENCES, LLC,   :
                                        :   Case No. 21-cv-4106 (AMD) (RER)
                    Plaintiffs,         :
                                        :
v.                                      :
                                        :
SAFE CHAIN SOLUTIONS, LLC; PATRICK      :
BOYD; CHARLES BOYD; WORLDWIDE           :
PHARMA SALES GROUP, INC. d/b/a          :
PHARMASALES.COM; ADAM S. BROSIUS;       :
BOULEVARD 9229 LLC; ISHBAY SHUKUROV;    :
PETER KHAIM; ZAFAR ABDULLAEV;           :
PROPHARMA DISTRIBUTION LLC; LEVI        :
ELLIS; SYNERGY GROUP WHOLESALERS        :
LLC; CARLOS VEGA; ISLAND CHEMISTS,      :
INC. d/b/a MEADOW DRUGS & SURGICAL;     :
RANDOLPH MOHABIR; V.L.S. PHARMACY       :
INC.; GOPESH M. PATEL; LIN PHARMACY     :
INC. d/b/a MAKKI PHARMACY; SAMUEL       :
YAKUBOV; MONICA A. NGO; ASCENSION       :
PHARMACY HOLDINGS I LLC d/b/a           :
MERMAID RX AND ARIEL PHARMACY;          :
ALEX GELBINOVICH; PAUL ROSELL; MED-     :
CONNECT ENTERPRISES, LLC; DHRUV         :
RALHAN; D&K HEALTHCARE SOLUTIONS        :
LLC; VENKATA SRINIVAS MANNAVA; DSP      :
CONSULTING INC.; JOHN                   :
PANAGIOTOPOULOS; MIKE ZANGARI;          :
RICCARDO MASSANA; STREAMLINE RX         :
LLC; PAVAN MANTRIPRAGADA; MFK           :
MANAGEMENT LLC d/b/a BOULEVARD 9229     :
& 9229 BOULEVARD; MAKE IT HAPPEN        :
MARKETING INC.; QUAN HERNANDEZ;         :
SCRIPTS WHOLESALE INC.; STEVEN          :
DIAMANTSTEIN; USDV PHARMA LLC;          :
NER250 LLC d/b/a SCRIPTS WHOLESALE;     :
JEFFREY S. BEETLEY; MARYLAND            :
PHARMACIES INC. d/b/a THE MEDICINE      :
SHOPPE #1802; PRIMERX INC.; SEKAR       :
VENKATESH; OMOM PHARMACEUTICALS         :
INC.; OMOM WHOLESALE CORP.; GUSTAVO     :

1

Case 1:21-cv-20255-KMW Document 674-7 Entered on FLSD Docket 08/12/2026 Page 2 of 12
Case 1:21-cv-20255-KMW Document 652 Filed 08/12/2026 Page 2 of 12
#203036

| | |
|---|---|
| FERNANDEZ; LUIS D. GONZALEZ HERRERO; | : |
| JORDAN RODRIGUEZ MATO; INVICTA | : |
| WHOLESALE SUPPLY LLC; JORGE CABA; | : |
| RXWHOLESALE.COM LLC; GABRIEL | : |
| BETESH; DANIEL GELBINOVICH; CESAR | : |
| CASTILLO WHOLESALERS LLC f/k/a CESAR | : |
| CASTILLO LLC; DNS DISTRIBUTOR LLC; | : |
| JULIO MARTIN GONZALEZ; PHARMA PAC | : |
| WHOLESALE CORP.; ANGEL TORAL; | : |
| GENTEK LLC; EDEL REYES; RAPID'S TEX | : |
| WHOLE SALES CORP; JOHN SANTOS; TITAN | : |
| DISTRIBUTION & SERVICES LLC; TIDY | : |
| GARAGES L.L.C.; GABRIEL DELGADO | : |
| RAMIREZ; CM PHARMACEUTICAL LLC; | : |
| JEFFREY W. GAFNEA; ROBERT W. GAFNEA; | : |
| JM SMITH DISTRIBUTION CORP.; CARLOS | : |
| HERNANDEZ; ASB WHOLESALE | : |
| DISTRIBUTORS LLC; SILVERLINE PHARMA | : |
| LOGISTICS LLC; ALBERTO ALONSO DIAZ, | : |
| LAZARO ROBERTO HERNANDEZ; | : |
| ARMANDO HERRERA; JOHN LEVITAN; | : |
| DAVID DUNN; PCSIONE, LLC; PHARMACY | : |
| CONSULTING SERVICES, INC.; STEPHEN | : |
| SMITH; EMILIO JUVIER VINA; MY MEDS | : |
| LLC; FRANK BETANCOURT; ITC GROUP, | : |
| LLC; JOSE ANTONIO HERNANDEZ; CARLOS | : |
| PIMENTEL; ABACUS DISTRIBUTORS INC.; | : |
| ABACUS DISTRIBUTORS INC.; PAVEL | : |
| LASHKEVICH; V & G WHOLESALE INC; | : |
| EDVIN OVASAPYAN; HAKOB KOJOYAN; | : |
| LORIK PAPYAN; STEPHEN SILVERMAN; | : |
| MAINSPRING DISTRIBUTION LLC; DAYNEL | : |
| GARCIA; PHARMA PAC LLC; YUSNIEL | : |
| FORCELLEDO PEREZ; COMPARX LLC; | : |
| BAKHTIYAR NABIEV; VALUECARE | : |
| PHARMACY INC.; RAOUL DIAMANTSTEIN; | : |
| LIEB PHARMACY, INC.; MOHAMMAD | : |
| ETMINAN; EVERYTHING PHARMACY | : |
| RELATED II, INC., D/B/A TOTAL REMEDY | : |
| AND PRESCRIPTION CENTER; WILLIAM | : |
| SCOTT WISE; PROVEN PHARMACEUTICALS | : |
| LLC; NICOLE ALSTON; BORIS ABRAMOV; | : |
| HASHEM YITBARACH LLC; JEFFREY | : |
| PETERSON; BRENNAN PAGE; TARIEL | : |
| BEGIYEV; JUAN HERNANDEZ; 2040 | : |
| HAVILAND CORP.; RONALD VIDAURRE; | : |

| | |
|---|---|
| VIBE ENTERPRISE, INC.; SOFITEL TRADING CORP; FRANCY BEDOYA; SKYLINE WORLD GROUP INC.; MARIA BEDOYA; ELITE DISTRIBUTION INC; SAM KESSLER; AVI KESSLER; THE PRECIOUS METALS GROUP INC.; MADISON BULLION LLC; GREEN CAPITAL INVESTORS LLC; IGOR AMINOV; GOLD TOWER REFINERY INC.; ALL AMERICAN HEAVY EQUIPMENT IMPORT & EXPORT, LLC; ALEXANDER ORRIOLS; BLUE SEA MARINE INC.; ALEX GALVAN; AMG LOGISTICS SKY LLC; POWER PRO LOGISTICS LLC; M & D CO. DISTRIBUTORS, LLC; LILIANA TERESA SAMPAYO MENA; MDSD ENTERPRISES LLC; FRANCIS FATA; ASCAN PHARMACY INC.; STANISLAUS MGBEOJIRIKWE; LACONIA AVENUE PHARMACY CORP.; and YISEL LOPEZ, | : : : : : : : : : : : : : : : : : : |
| Defendants, and | : : |
| SWETHA KETINENI; BABASHILOH ENTERPRISES LLC; 5 CONTINENTAL VENTURES LLC; AP FUNDING LLC; 441 WILLIS AVE LLC; LA VIE JEWELS OF NY LLC; AG WORLDWIDE SALES, INC.; ETZHAIM INC.; OKSANA POLTILOVA; 214 JAMAICA LLC; MARK POLTILOV, IN HIS CAPACITY AS TRUSTEE OF THE KHAIM FAMILY IRREVOCABLE LIVING TRUST; A&P ROCKAWAY LLC; B&O ESTATES LLC; 91 PARK LLC; 91 REGO LLC; and 93 EVERTON LLC, | : : : : : : : : : : : : : : |
| Relief Defendants. | : |

------------------------------------------------------------ X

## SIXTH AMENDED COMPLAINT

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (together, "Gilead" or "Plaintiffs"), by and through their counsel, Patterson Belknap Webb & Tyler LLP, for their Sixth Amended Complaint against the Defendants listed above and in the Appendix attached hereto, allege as follows:

3

## UNTOLD MILLIONS IN ILLEGAL PROFITS

1. **Lazaro Roberto Hernandez, a.k.a. "Rob"**

234. Kingpin Lazaro Hernandez sits at the top of the known counterfeiting conspiracy. He set up the organization of the counterfeiting ring and its money-laundering apparatus, and he exercised ultimate control over many Supplier Defendants that sold the counterfeits. The lion's share of the hundreds of millions of dollars earned by the sale of counterfeit Gilead-branded HIV medication went to Hernandez and his co-conspirators through a complex money-laundering scheme.

235. Hernandez worked in the shadows. He took extraordinary measures to conceal his identity and ensure his name was not tied, in writing or otherwise, to the counterfeiting conspiracy. Hernandez avoided email and written communications and used exclusively pre-paid "burner" cell phones. Even to his lieutenants, the Leader Defendants, he was known only as a voice on the phone using the single-name pseudonym "Robert" or "Rob." When one of the Distributor Defendants told Leader Defendant Ralhan that they wanted to speak with "Rob," Ralhan responded: "Robert doesn't want to talk to anyone… I've tried trust me, he is not interested."

236. Written communications with the Leader Defendants confirm that "Rob" was the ultimate source of the counterfeits being sold by the Supplier Defendants. For example, Leader Defendant Ralhan and Distributor Defendant Brosius repeatedly referred to "Rob" as the "AD," or authorized distributor, for the counterfeits being sold by Supplier Defendant Gentek.

237. "Rob" was also the individual in charge of making sure the Supplier Defendants were paid. The Distributor Defendants referred to "Robert" as "the guy upset about the money," and spoke of the need to "get Robert (the AD) happier."

238. Leader Defendant Ralhan identified "Rob" as the source of counterfeits sold by Supplier Defendant Gentek. A prepaid cell phone that "Rob" used to communicate with others in the counterfeiting conspiracy was also listed as the phone number associated with a bank account opened for Supplier Defendant Omom. That same cell phone number received two-factor authentication texts when "Rob" (actually Kingpin Defendant Hernandez) viewed the Omom bank account online. The Omom bank account received tens of millions of dollars in counterfeiting proceeds.

239. ==Using his "Rob" persona, Hernandez exercised ultimate control over several additional Supplier Defendants and their sale of enormous quantities of counterfeit Gilead-branded HIV medication.==

240. Gilead identified "Rob" by subpoenaing records associated with the various "burner" prepaid cell phones he used to conduct business on behalf of the conspiracy. Although those phone accounts did not have any subscriber information – which is the point of using burner phones – the carriers did maintain basic geolocation data.

241. Using the subpoenaed phone records, Gilead and its investigators identified dates when "Rob" left his base of operations in downtown Miami and appeared in Las Vegas hours later, indicating that "Rob" had flown cross-country. Gilead's investigators then used public databases to identify public and private flights that left southern Florida and arrived in Las Vegas on dates and within time ranges indicated by the phone records. Gilead determined that the only flights that matched certain of "Rob's" Las Vegas trips were on private planes affiliated with a casino – *i.e.*, casino-sponsored private flights for high rollers. Gilead subpoenaed the flight manifests for those flights and reviewed the flight manifests and geolocation data to determine

"Rob's" true name and identity. Gilead further confirmed that Kingpin Defendant Hernandez flew on all of those flights.

242. Subpoenaed records from the casino that sponsored Hernandez's flights confirm that he is a high-stakes gambler who lost several million dollars at that casino alone. The casino prepared numerous Suspicious Activity Reports on Hernandez, which casinos are required under federal law to submit when they suspect money-laundering activity. These reports noted that Hernandez walked into the casino with extremely large amounts of cash held in plastic bags, and that he provided the casino verifiably false explanations of where the money came from. In reality, Hernandez was gambling with illicit proceeds of the counterfeiting ring, and was using the casino to launder the cash.

243. Hernandez is a convicted felon. He was previously arrested for armed robbery with a deadly weapon. In 1990, he was indicted and ultimately convicted for conspiring to possess two kilograms of cocaine with intent to distribute, and was imprisoned until 2000.

244. On June 17, 2022, when Gilead was preparing its papers to add Hernandez to this action, the FBI arrested Hernandez, charging him with multiple counts of conspiring to introduce adulterated and misbranded drugs, conspiring to traffic drugs with false documentation, and several crimes related to money laundering. The government has stated it was concerned that Hernandez was planning to flee the country on a private plane.

245. The federal government's indictment alleges that from 2019 to at least the end of 2021, Hernandez conspired to "establish[] and obtain[] wholesale drug distributor licenses for" fly-by-night companies across the United States, including Supplier Defendant Gentek and Supplier Defendant My Meds. Hernandez and his co-conspirators illegally diverted "large quantities" of HIV medication and "repackaged the drugs and falsified their packaging,

63

T3s/pedigrees, and other labeling," and "introduced these adulterated, misbranded, and diverted drugs into interstate commerce" by selling and distributing them to co-conspirators at unnamed "Wholesale Companies," who then sold the bottles to "pharmacies located throughout the United States."

246. The government stated at Hernandez's detention hearing that in the instant civil suit Gilead was "able to seize thousands of bottles of HIV prescription drugs and tie them back to companies [*i.e.*, Supplier Defendants] that the evidence shows were really controlled by Lazaro Hernandez."

247. ==In all, the government's indictment alleges that Hernandez and his co-conspirators received over $230 million for these illegally sold medications.== Hernandez is alleged to have laundered those illicit gains by causing the fly-by-night distributors to send the funds to various shell companies, including Asset Holder Defendant MDSD Enterprises.

248. At Hernandez's detention hearing, the government specified that Hernandez "led an organization in Miami that acquired expensive prescription drugs on the street and by other means and repackaged those drugs and created fraudulent documentation" to sell them, naming as examples Gilead's HIV medications "Biktarvy and Truvada." The government specified that "[t]he mere nature of this scheme involves a lot of cash. The drugs have to be acquired from the street [*i.e.*, purchased from patients] or by theft. Then they have to be relabeled and their pedigrees falsified." *Id.* The government noted that this causes harm to patients, including because some of the repackaged HIV drugs sold by Mr. Hernandez's network had foreign medication inside.

249. The government has stated that Hernandez not only paid others to launder the conspiracy's illicit gains through shell companies, but that he also paid a co-conspirator to

64

withdraw the cash from those companies and hand-deliver the cash to Hernandez personally, so that Hernandez never directly interacted with the money-laundering entities.

250. Shortly before he was arrested, Hernandez was involved in the intimidation and beating of a former co-conspirator who was cooperating with the government and was a government witness. That cooperator was spotted and beaten in a Florida strip club, and the witness was told by his assailant, in Spanish, "that's what you get for snitching." Shortly after the assault, the cooperator received an Instagram post that stated: "I saw you get dropped last night at [the strip club]. You rat. Rene is on you, bitch. Mr. Lux, nawww, Mr. RAT better." The Instagram account that sent that post was opened using a burner cell phone number that Hernandez used for counterfeiting business – the same one that was used to open the bank account for Supplier Defendant Omom.

### 2. Kingpin Defendant Armando Herrera a.k.a "Thomas"

251. Kingpin Defendant Armando Herrera also sits at the top of the known counterfeiting conspiracy. With his co-conspirator Kingpin Defendant Hernandez, Herrera set up the organization of the counterfeiting ring and its money-laundering apparatus and exercised ultimate control over many Supplier Defendants that sold the counterfeits.

252. Herrera also worked in the shadows. Like his co-Kingpin Defendant Hernandez, Herrera took extraordinary measures to conceal his identity, including avoiding written communications and using burner cell phones. Herrera also used a single-name pseudonym when dealing even with his lieutenants: "Thomas," or the Spanish-language diminutive "Tomasito."

253. Herrera conspired with Hernandez and others to sell extremely large quantities of counterfeit Gilead-branded HIV medication in the United States. Herrera ultimately controlled

Case 1:21-cr-00255-PAD-DJS Document 274-7 Filed 03/16/26 Page 9 of 12
Case 1:20-cv-04573-MKV Document 441-1 Filed in FLSD Docket 03/16/2026 Page 9 of 12
#20880

multiple Supplier Defendants, including Supplier Defendants Omom and Invicta. Distributor Defendant Brosius referred to "Thomas" as the "HIV middle man," and identified "Thomas" as the individual behind both Omom and Invicta.

254. For example, in April 2021, Brosius wrote that he was "waiting [o]n Thomas for invicta." And in May 2021, Distributor Defendant Safe Chain contacted "Thomas" via the email OmomPharmaceuticals80@gmail.com to order counterfeit HIV medication from Omom. And in June 2021, employees at Distributor Defendant Worldwide Pharma texted a burner cell phone whose number was saved in their phones as "Thomas" or "Tomasito" in an attempt to cancel a forthcoming delivery of counterfeit Gilead-branded HIV medication from Omom.

255. Similarly to how it identified "Rob," Gilead was able to identify "Thomas" by subpoenaing the records of the burner cell phone he used for the counterfeiting conspiracy's business and using the geolocation data from that phone to identify the dates and times of his air travel. Gilead and its investigators then matched "Thomas's" air travel with public and private flights, subpoenaed the manifests of those flights, and identified Kingpin Defendant Armando Herrera as having been on board on all of the identified flights. Again, Gilead was only able to obtain the name and identity of "Thomas" by diligently reviewing the flight records.

256. Gilead subsequently confirmed Herrera's identity by tracing illicit proceeds from Supplier Defendant Omom to Herrera's front door: he used counterfeiting proceeds to renovate his home. Gilead traced Omom's counterfeiting profits to a money-laundering shell company, Asset Holder Defendant Titan. Titan paid a significant amount of the counterfeiting profits to a company that sells imported stonework and tile. Gilead subpoenaed the records of that seller, which produced an invoice for stonework to be installed in a residential home. The "bill to" line

on the invoice listed Asset Holder Defendant Titan (the money launderer for Omom's counterfeiting proceeds), but the invoice identified the purchaser as Armando Herrera.

257. Mr. Herrera has a history of making illicit profits through defrauding individuals living with HIV. In 2008, he pled guilty and was sentenced to three years' imprisonment for running what the government called "a fraudulent HIV infusion clinic" that made fake Medicare claims and also subjected patients to "unnecessary procedures such as paravertebral joint injections."

258. Herrera lives with his girlfriend, Asset Holder Defendant Yisel Lopez. Herrera owns no real estate or vehicles in his own name. Instead, Herrera maintains counterfeiting proceeds, and real estate purchased with counterfeiting proceeds, under Lopez's name. Lopez is a former chiropractic assistant with no independent income. She is the owner of two LLCs: one that owns Herrera's home, and one that owns Herrera's mother's home. Lopez also personally received repeated payments from two money-laundering entities that themselves received counterfeiting proceeds from Supplier Defendants Omom and Abacus, and personally sent at least one substantial payment back to one of those money laundering entities.

276. As with the other Leader Defendants, Dunn also helped recruit pharmacies to purchase the counterfeit HIV medication he was supplying to Scripts, and was paid an additional cut of the counterfeiting proceeds based on those sales to pharmacies.

277. Dunn operated in part through two companies he wholly owned: newly named Defendants Pharmacy Consulting Services Inc. and PCSIONE LLC. Mr. Dunn received his cut of the counterfeiting proceeds through PCSIONE LLC. And Dunn conducted business with Scripts under the name of, and using the email signature for his other company, Pharmacy Consulting Services, Inc.

### 5. Leader Defendant John Levitan

278. Like his co-Leader Defendants, John Levitan managed the relationship between Supplier Defendants and Distributor Defendants, and is responsible for tens of thousands of bottles of counterfeit Gilead-branded HIV medication being sold into the U.S. distribution stream.

279. But unlike the other Leader Defendants, Levitan is also directly connected to the Kingpin Defendants, and knew them beyond their pseudonyms. Levitan and Kingpin Defendant Hernandez know each other well, and both serve or served as executives of the same Florida-based boat company. In fact, Levitan is responsible for introducing Hernandez – known only as "Rob" to everyone else – to Distributor Defendants Safe Chain and Worldwide Pharma.

280. Levitan is also a money-laundering expert, and has a central role in the counterfeiting conspiracy's complex money-laundering apparatus. Levitan is a convicted felon who spent 14 years in prison on money laundering charges. Among the evidence introduced against Levitan was the fact that he offered a detailed plan to an undercover IRS agent to launder what Levitan thought was $1 million in illegal narcotics profits. Since his release from prison in

2007, Levitan has formed or been named the principal of over 40 different Florida corporate entities, almost of all them registered to the same address in Pensacola, Florida, and approximately a dozen of which purport to be in the medical field.

281.  Levitan also performed duties for the conspiracy similar to his co-Leader Defendants.  For example, Levitan was the primary contact for Supplier Defendant Synergy Group Wholesaler LLC and its principal, Defendant Carlos Vega.  For example, a May 2021 email concerning Synergy states: "I believe you know John [Levitan]. . . . John is going to be involved with inventory and acquisition . . . .  Feel free to discuss things with him.  Nothing else will change on the Po's [sic] and payments and such."  And the following month, Levitan followed up with Defendant Vega, the principal of Synergy, in writing: "We are looking for [more] inventory and I wanted to speak to you, to lock in an agreement for future orders."

282.  Under Levitan's direction, Synergy supplied a large volume of counterfeits to Safe Chain, selling millions of dollars of Gilead-branded medications with clearly counterfeit pedigrees.

283.  Levitan was also involved in managing Supplier Defendant Invicta's relationship with Safe Chain.  On May 21, 2021, Invicta's owner on paper, Defendant Jorge Caba, emailed Levitan and Brosius, writing, "Here is a copy of how the t3 [*i.e.*, the pedigree] is gonna look like. SafeChain address it not on the paper because I dont have it, but it will be there.  Thank you for the opportunity."  A few days later, on May 25, 2021, Caba sent a copy of Invicta's state distribution license directly to Levitan.

284.  Levitan also introduced at least one other intended supplier of counterfeits to Safe Chain, but this Court enjoined Safe Chain's purchase and sale of Gilead products before that new supplier made a sale.

74